IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ACIE BLACK,                              )        CASE NO. 5:17-CV-1373
                                         )
                    Plaintiff,           )
                                         )
        v.                               )
                                         )        MAGISTRATE JUDGE
                                         )        KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL                    )
SECURITY ADMINISTRATION,                  )
                                         )        **MEMORANDUM OPINION & ORDER**
                    Defendant.            )

Plaintiff Acie Black ("Black") seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying his application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties.  Doc. 16.

For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Black filed his applications for SSI and DIB in April and May 2014, respectively,

alleging a disability onset date of May 1, 2010.  Tr. 21, 307.  He alleged disability based on the

following: neck injury, arthritis, left arm tendon damage, major neck surgery, multiple left arm

surgeries, "crushed L5 lumbar," arthritis and bursitis in both shoulders, carpal tunnel, many

fractured bones, dizzy spells, severe back pain, PTSD, and severe depression.  Tr. 191.  After

denials by the state agency initially (Tr. 155, 156) and on reconsideration (Tr. 187, 188), Black

requested an administrative hearing.  Tr. 223.  A hearing was held before Administrative Law

Judge ("ALJ") Jeffrey Raeber on April 1, 2016, Tr. 44-91, wherein Black amended his alleged

onset date to February 22, 2014.  Tr. 45, 306.  In his May 1, 2016, decision (Tr. 21-36), the ALJ

determined that there are jobs that exist in significant numbers in the national economy that

Black can perform, i.e. he is not disabled.  Tr. 35.  Black requested review of the ALJ's decision

by the Appeals Council (Tr. 16) and, on April 25, 2017, the Appeals Council denied review,

making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Black was born in 1964 and was 49 years old on the date his applications were filed.  Tr.

28.  He has the equivalent of a GED and last worked in 2010 as a meat cutter in a

slaughterhouse.  Tr. 49, 64.  He also climbed poles for a cable company and worked as a finisher

in a plant that made refrigeration trucks.  Tr. 53, 55.

### B. Relevant Medical Evidence

Physical: Black has a history of degenerative disc disease in his lumbar and cervical spine

and multiple injuries and surgeries.  Tr. 475-476, 1301 (throughout the years, fractures in his

lumbar spine, cervical spine, sternum, hands, etc.)  He had cervical surgery in 1992 and surgery

on his left arm in 2010.  Tr. 1301.  He has a history of alcohol abuse and stopped drinking in

2012.  Tr. 1301.  He previously applied for disability and his application was denied in 2012.  Tr.

95-108.

On February 4, 2014, Black saw Jianming Han, M.D., his primary care provider,

complaining of back pain and requesting a referral to pain management.  Tr. 696.  He had pain

between his shoulder blades and in his low back radiating into his left buttock and sometimes

shooting down to the thigh area.  Tr. 696.  His pain was variable; on a good day it was

"tolerable" and on a bad day, 10/10.  Tr. 696.  It was worse with sitting for a long time and on

that day it was 6/10. Tr. 698. He was taking over-the-counter Aleve. Tr. 698. He had just gotten custody of his three grandchildren, aged 1, 4 and 6 and could not physically pick them up. Tr. 698. He reported having previously had physical therapy, which had helped him. Tr. 698. Upon exam, he had mild tenderness in the lumbar and thoracic spinal areas with no focal deficits, normal sensation, normal reflexes, normal coordination, and normal muscle strength and tone, except 4/5 strength in his left leg due to pain. Tr. 698. His spinal range of motion was limited in all directions especially forward and backward bending and his cervical spine had some flattening. Tr. 698. He had a normal gait with tandem walking and walking on heels and toes. Tr. 698. Impressions included thoracic back pain and degenerative disc disease lumbosacral spine with radiculopathy. Tr. 699.

On February 22, Black went to the emergency room with complaints of back pain beginning the day before when he was moving sand. Tr. 700. He was also shoveling snow over the weekend. Tr. 700. His exam was unremarkable other than back pain and paraspinal muscle tenderness. Tr. 700. He was assessed with an acute lumbar strain and provided prescriptions for hydrocodone, naproxen and cyclobenzaprine. Tr. 701.

At a follow up appointment with Dr. Han on February 25, Black reported that he had not gotten a pain management appointment yet. Tr. 703. He stated that his back had been stiff and sore from shoveling snow and that the next day "he was grinding the liftspring of his truck," picked up a heavy chest and put it in the back of his truck and he heard a "popping/grinding sound over [his] low back." Tr. 703. He rated his pain an 8/10 and stated that a heating pad had helped it feel better. Tr. 703. His physical exam findings were the same as his last visit. Tr. 705. Dr. Han continued his naproxen and cyclobenzaprine prescriptions. Tr. 705.

On March 13, 2014, Black attended his first pain management appointment with Jeffrey Zachary, M.D.  Tr. 1089.  He reported low back pain for years, now shooting down his left leg, and numbness and tingling.  Tr. 1089.  His pain was 4/10 that day.  Tr. 1089.  His pain was made worse by sitting, walking, standing and using stairs, and better with use of a TENS unit, physical therapy, heating pad, and ice packs.  Tr. 1089.  Over the counter medications did not work.  Tr. 1089.  He was feeling down more and sleep was more fragmented; he had anhedonia, generalized anxiety and perseveration.  Tr. 1089.  Upon exam, he walked with an antalgic gait to and from the exam room but was able to ambulate on his heels and tip toes without difficulty.  Tr. 1089.  He had a limited range of motion in his spine, spinal tenderness (worse on the left), muscle spasms upon deep palpation, positive straight leg raises, and 4+/5 motor strength in the muscles on his left and 5/5 on the right.  Tr. 1090.  Diagnoses were degeneration of lumbar or lumbsosacral intervertebral disc, thoracic or lumbosacral neuritis or radiculitis unspecified, unspecified arthropathy involving other specified sites, and myalgia and myositis.  Tr. 1090.  Dr. Zachary recommended Black continue his current medications (Percocet and cyclobenzaprine) and ordered a lumbar MRI.  Tr. 1090.

On April 14, 2014, Black saw Dr. Han complaining of slow urination and he also had a headache.  Tr. 707.  He reported that his upper back and neck had been tense and that he took his muscle relaxer and it improved.  Tr. 707.  He also needed new eyeglasses and would forget to eat.  Tr. 707.  He was "very busy, on the go all the time," fishing, and going to his grandson's soccer games.  Tr. 707.  He denied anxiety, mental problems or depression.  Tr. 707.

On May 23, 2014, Black reported to pain management that he had 70% improvement after an injection in his back two weeks prior and that it had worked well for him.  Tr. 1093.  He continued to do okay with his medications and they did not cause side effects.  Tr. 1093.  He

stated that he had pain in his right shoulder shooting up into his neck and giving him headaches. Tr. 1093. He also stated that he was out of pain medication and his pain was 7/10. Tr. 1093.

On June 3, 2014, Black had an MRI of his spine, which showed multilevel degenerative disc degeneration, spondylosis, and disc bulges. Tr. 1115-1116. He had L2-3 Schmorl's nodes with moderate type I changes; L3-4 disc bulge with superimposed left foraminal/far lateral disc herniation impinging on the exiting left L3 nerve root; L4-5 circumferential disc bulge; and L5-S1 right central annular tear. Tr. 1116.

On June 2, 2014, in connection with Black's application, an SSA field office employee had a telephone call with Black and observed that Black had no difficulty understanding or concentrating during the interview, he was capable and answered questions appropriately, and he was not forthcoming with medical information aside from what he already submitted online. Tr. 308-309.

On July 10, Black told Dr. Zachary that he had eaten food and, as a result, he was unable to have his next injection. Tr. 1099. His pain was 8/10 and he needed a medication refill. Tr. 1099. His urine drug screening was deemed non-compliant and the pain management clinic discharged him from care. Tr. 1100.

On August 7, 2014, Black visited a new pain management clinic and saw A. Harris Basall, M.D., for an evaluation of his neck and lumbar pain. Tr. 1295. Black reported doing reasonably well under Dr. Zachary's care but was getting significantly worse since stopping marijuana. Tr. 1295. He had a pain level of 8/10. Tr. 1296. Dr. Basall ordered a toxicology report before providing further care. Tr. 1297. Thereafter, Dr. Basall prescribed a Duragesic pain patch. Tr. 1293.

On September 30, 2014, Black saw Dr. Basall and stated that, since he has been using his pain patch, his pain improved to 6/10.  Tr. 1291.

On October 7, 2014, Dr. Basall gave Black an epidural nerve root block in his lumbar spine.  Tr. 1289.  Black reported 100 percent improvement on October 28.  Tr. 1287.  On November 25, he reported having a 65% improvement and his pain was 4/10.  Tr. 1285.  On December 3, Black received a second epidural nerve root block.  Tr. 1283.  On December 24 he reported an 80% improvement and his pain level was 3/10.  Tr. 1281.

On January 29, 2015, Black saw Dr. Basall and reported a pain level of 8/10.  Tr. 1279.  Dr. Basall gave him an intra-articular joint injection in his right hip on February 17 and Black reported a post-procedure pain level of 2.  Tr. 1277.  On February 25 he reported 100% improvement.  Tr. 1275.  His pain was 6/10.  Tr. 1275.  Prolonged sitting, prolonged standing, bending forward, and lifting heavy weight exacerbated his pain.  Tr. 1275.  On April 22, at a follow-up visit, he still had 95% improvement and his pain was 2/10.  Tr. 1271.  On May 20, his right hip was good but he had low back pain.  Tr. 1268.  His pain was 8/10 and he stated that he had been without his pain patch for about three days.  Tr. 1268.

On June 30, 2015, Black visited Mark Stutzman, D.O., a family practitioner, for a well visit.  Tr. 1300.  He was a current every day smoker and had been for the past 30 years and he engaged in moderate exercise with martial arts.  Tr. 1302.  Upon exam, he appeared well, had no edema in his extremities or focal neurological deficits, had normal sensation, coordination, muscle strength, and muscle tone, and appeared mildly anxious with a normal mood, normal attention span, and normal concentration.  Tr. 1303.  Dr. Stutzman prescribed a fentanyl patch.  Tr. 1303.

On July 21, 2015, Black was supposed to have an injection but, when he arrived, he told Dr. Basall that he had eaten and, therefore, could not have the injection. Tr. 1263. Dr. Basall commented that this is the second time Black had done this, that Black had been told many times not to eat prior to an injection, that Black left the clinic but returned, at which point Dr. Basall explained the situation to him again with security officers present, and then discharged Black from care. Tr. 1263.

On September 2, Black saw Dr. Stutzman to discuss tobacco cessation and chronic pain control. Tr. 1305. He wanted to transition away from his injections from pain management, as they provided minimal benefit, and wean off opioid therapy at pain management. Tr. 1305. He was currently intermittently wearing his fentanyl patch. Tr. 1305. Upon exam, he had a normal mood and affect and a normal attention span and concentration. Tr. 1307. Dr. Stutzman adjusted his medication to taper off opioids and prescribed medication and nicotine gum for smoking cessation. Tr. 1307.

By September 16, Black had stopped wearing his fentanyl patch and Dr. Stutzman prescribed Tramadol for his pain. Tr. 1313-1314. As Dr. Stutzman expected, Black reported opioid withdrawal symptoms of insomnia, anxiety, and tremors that lasted about a week. Tr. 1311. Upon exam, he had a normal mood and affect, and normal attention span and concentration. Tr. 1313. On September 30, Black reported that the Tramadol did cause some benefit and allowed him to improve his function; however, in order to still do the things he would like to do, he had to take oxycodone. Tr. 1316. He reported right hip pain due to possible osteoarthritis. Tr. 1316. He rated his pain 6/10. Tr. 1319. Dr. Stutzman prescribed a trial of morphine to continue the process of weaning off opioids. Tr. 1316.

On October 8, 2015, Black saw Dr. Stutzman for a routine follow-up of his chronic pain syndrome. Tr. 1325. He still had pain but said that he could function with medication and was interested in a formal exercise program. Tr. 1325. Upon exam, he sat comfortably on the examination table, had a normal mood and affect, and was cooperative. Tr. 1325. He rated his pain (lower back, hip) a 5/10. Tr. 1328.

On October 13, 2015, Black told a physical therapist that he aggravated his back helping a friend move and putting up a deer stand. Tr. 1376. He helped take care of his grandson, including taking him to school and sport functions. Tr. 1376. His pain made it difficult to complete activities of daily living, take care of his grandson, and hunt. Tr. 1376. He reported that a cortisone shot in his right hip worked for about 5 months but had now worn off, and he had a TENS machine and a heating pad that he could use at home for pain. Tr. 1376. He rated his back pain level a 7 and his right hip pain level a 3. Tr. 1379. He attended six sessions and was discharged in November 4, 2015, with an overall improvement of 100%. Tr. 1331, 1331. He could sit through church without having to get up, he was getting up into a tree stand easily, and he was sleeping well. Tr. 1331. He met his goal of a pain level of 4/10. Tr. 1331. He was going to continue with pool therapy at the YMCA. Tr. 1332.

The next day, Black explained to Dr. Stutzman that he had participated in physical therapy because, three weeks prior, he injured his back while pulling on a bowstring. Tr. 1333. He experienced significant relief from his therapy and he wanted to cease going so that he could save some visits for later in the year, if necessary. Tr. 1333. His medication regime provided significant relief and allowed him to maintain good function. Tr. 1333. Upon exam, he sat comfortably on the examination table, had a normal mood and affect, and was able to transfer from sitting to standing without significant difficulty. Tr. 1333. He had muscle spasms and

several tender points in his upper trapezius muscles but no sign of leg weakness. Tr. 1333. He rated his pain level as 5. Tr. 1336.

At a follow up appointment with Dr. Stutzman on February 5, 2016, a drug screen was positive for opioids and marijuana. Tr. 1339. Black reported that medication provided significant relief and allowed him to maintain good function. Tr. 1341. He asked Dr. Stutzman to complete disability paperwork. Tr. 1341. He rated his back pain level at a 6.5. Tr. 1343. Upon exam, he had tenderness to palpation in his legs and some muscle spasm. Tr. 1344. He had 4+/5 strength in his upper and lower extremities. Tr. 1344. He had a normal mood, affect, attention and concentration. Tr. 1344. Dr. Stutzman opined that Black had functional improvement with his pain management regimen and commented that he would complete the disability paperwork "as able." Tr. 1344.

Mental: On April 7, 2014, Black visited the Counseling Center of Wayne and Holmes Counties. Tr. 824. He had not been seen since June 2013. Tr. 824. He was hearing voices, feeling depressed and having anxiety. Tr. 825. His goal was to have stability, have the voices go away, and be normal. Tr. 824. He was diagnosed with posttraumatic stress disorder, major depressive disorder, psychosis, NOS, alcohol dependence in early remission, cannabis abuse, and a history of polysubstance abuse. Tr. 828.

On May 9, 2014, Black was hearing a demon's voice telling him to do things and he complained that people were talking about him. Tr. 1034. He had to leave WalMart the other day because he got too panicky. Tr. 1034. He was homeless and had been off medication for 9 months. Tr. 1035. Upon exam, he was calm, friendly, had good eye contact, normal speech, good concentration, memory, insight and judgment, a full affect, logical thought process, and a mood that was close to euthymic. Tr. 1034-1035. He was started on Seroquel. Tr. 1035.

On June 12, he reported hearing several voices and stated that he had been hearing them since he was in his 20s. Tr. 1032. Seroquel had not improved this problem. Tr. 1032. Black reported using marijuana until three months prior. Tr. 1032. He suffered from chronic pain, all day every day, rated 8-10/10. Tr. 1032. Upon exam, he was in mild distress due to pain. Tr. 1032.

On August 7, 2014, Black reported paranoia, increased anxiety, and severe pain that affected his mood. Tr. 1141. The Seroquel helped with the voices but he was very anxious and suspicious. Tr. 1141. He was started on Cymbalta. Tr. 1142.

On August 13, 2014, Black underwent an Adult Diagnostic Assessment at the Counseling Center. Tr. 1130. He was homeless and reported that he "couch surfs" from place to place. Tr. 1130. He detailed a substantial history of violent acts and abusing alcohol. Tr. 1130. He had participated in AA meetings and he was reluctant to engage with people because he was anxious around people he didn't know. Tr. 1132. He was anxious and had problems staying focused/sitting still. Tr. 1133. He became frustrated easily when he did not see an immediate reward, had poor boundaries especially when drinking, was often fearful and suspicious, had hallucinations, and had problems with his memory. Tr. 1135. He was diagnosed with psychosis NOS, recurrent depressive psychosis, and anxiety state. Tr. 1136.

In December 2014, Black visited the Counseling Center, stated that he went hunting for fun, and shared a picture of a deer he had recently killed. Tr. 1207. He was less depressed and had good concentration and memory. Tr. 1207. On February 12, 2015, he reported that he does "okay" in the community but that he experienced a lot of anxiety attacks that caused him to not be able to leave the house or enter a store. Tr. 1199.

On March 20, 2015, he had high anxiety, depressed mood, insomnia, and reported hearing voices. Tr. 1205. His Seroquel and Trazodone were increased. Tr. 1206. In July he was feeling the same, and his Trazodone was stopped and he was started on Amitriptyline. Tr. 1233-1234.

In September 2015, Black reported that he walked in the woods behind his mobile home to decompress. Tr. 1215. He had been compliant with medication but not compliant with his visits. Tr. 1215. He occupied his mind by planning to have custody of his young grandson. Tr. 1215. In December 2015, he said that he and his ex-wife had been raising their three grandchildren, but that the youngest one had gone to live with his father in October and that he, Black, had not felt well since then. Tr. 1229.

On March 18, 2016, Black said that he felt stressed with financial problems and an ongoing custody battle over his grandson. Tr. 1363. He was started on Belsomra. Tr. 1364. On April 4, he was somewhat improved. Tr. 1355. He heard voices periodically, reported insomnia, and he took care of his eight-year old grandson. Tr. 1355.

### C. Medical Opinion Evidence

#### 1. Treating Source Opinion

On March 5, 2016, Dr. Stutzman completed a physical medical source statement. Tr. 1412-1413. Dr. Stutzman opined that Black could lift/carry 25 pounds occasionally and 15 pounds frequently, due to degenerative disc disease of his neck and back; stand/walk 4 hours total in a workday, one hour without interruption, due to the degenerative disease in his back, which was worse with prolonged activity, and osteoarthritis in his right hip; and that his ability to sit was not impaired. Tr. 1412. He could rarely climb, stoop, crouch, kneel, and crawl and could occasionally reach, push/pull and perform gross manipulation; and he could frequently perform

fine manipulation.  Tr. 1412-1413.  His pain was severe, interfered with his concentration, took

him off task, and caused additional absenteeism.  Tr. 1413.  He required a sit/stand/walk at will

limitation and extra breaks.  Tr. 1413.

### 2. Consultative Examiner

On August 11, 2014, Black saw Curt Ickes, Ph. D., for a consultative examination.  Tr.

1122-1126.  He reported a history of legal troubles due to alcohol abuse and stated that he had

been sober for about two years.  Tr. 1123.  He used to self-medicate with alcohol until he started

taking psychiatric medications.  Tr. 1124.  As daily activities, Black reported that he went into

the woods some days, that his shopping trips were short or infrequent because he did not like to

be in crowds, and he had problems completing basic household chores due to physical pain.  Tr.

1124.  He could not do the "simplest task" and could not work for more than 5 minutes without a

break.  Tr. 1124.  He could independently handle his finances and make and keep appointments.

Tr. 1124.

 Black reported trouble sleeping, sadness, occasional crying spells, a loss of interest in

pleasure seeking activities, thoughts of hopelessness and helplessness, social isolation, sleep

disturbance, low self-esteem, poor concentration, and he would sometimes hear voices, although

he recognized that the voices were not real.  Tr. 1124.  The voices occurred during severe periods

of depression but they improved with medications.  Tr. 1124.  The voices said bad things about

him or made fun of him.  Tr. 1125.  He would become very anxious and felt that people were

watching him; these episodes lasted 15-60 minutes.  Tr. 1125.  Dr. Ickes diagnosed Black with

depressive disorder NOS, panic disorder without agoraphobia, alcohol dependence in remission,

and antisocial personality disorder.  Tr. 1125.  Dr. Ickes opined that Black maintained sufficient

attention and concentration during the interview, seemed capable of basic job tasks but might

find complex tasks challenging, his persistence and pace may be somewhat impaired, and it was possible that exposure to work stress would increase the severity of psychological symptoms. Tr. 1126.

### 3. State Agency Reviewers

<u>Physical</u>: On August 8, 2014, state agency reviewing physician Leslie Green, M.D., reviewed Black's record.  Tr. 149.  Regarding Black's RFC, Dr. Green adopted the prior ALJ's RFC determination that Black could perform light work with some manipulation limitations.  Tr. 149.  On November 24, 2014, William Bolz, M.D., reviewed Black's record and adopted Dr. Green's opinion.  Tr. 166-167.

<u>Mental</u>: On August 8, 2014, state agency reviewing psychologist Kristen Haskins, Psy.D., reviewed Black's record.  Regarding Black's RFC, Dr. Haskins opined that Black could perform simple, repetitive tasks in a stable environment; have limited contact with others; and could have infrequent and explained changes.  Tr. 152.  On December 5, 2014, Jennifer Swain, Psy.D., reviewed Black's record and adopted Dr. Haskins' opinion.  Tr. 169.

### D. Testimonial Evidence

#### 1. Black's Testimony

Black was represented by counsel and testified at the administrative hearing.  Tr. 49-81. He testified that he lives by himself.  Tr. 57.  He has three grandchildren and one, who is eight years old, spends a lot of time with Black at his house.  Tr. 57-58, 60.  His grandson plays and helps him out with things like the trash.  Tr. 60.  Black drives him places such as to his mother's house, his soccer games, or anywhere he needs to go.  Tr. 61.  They go to soccer games about twice a week during the season.  Tr. 61.  When his grandson is not with him, Black spend a lot of

time in the woods, which are near where he lives, depending on how his back is feeling that day. Tr. 62.

Black has lived in his house for a little over a year; previously, he lived "here and there" and also at Pathway, where he went for help with his drinking, where he lived for about a year and attended AA meetings. Tr. 61, 75. He drives, but his friend drove him to the hearing. Tr. 61. He no longer hunts; he stopped 1 ½ years prior to the hearing. Tr. 63. He tried to go bow hunting with some guys "last year" but he could not stand and did not last very long. Tr. 63. He also loves to go fishing and last went "last year." Tr. 63. He goes to church on Sundays and sometimes he will go to church activities on other occasions, such as watching plays that the kids put on. Tr. 64. He cooks for himself and his former girlfriend helps him a lot; she will bring him chili or soup and he will eat it for a few days. Tr. 64. He tries not to do any shopping but is able to go to the store if he is having a good day. Tr. 64. He hates to travel. Tr. 64. He does not really like to read, although he does read the bible, and he does a bible study every day on television. Tr. 65. He does not use a computer or know how to use one. Tr. 65.

When asked why he was unable to work, Black explained that he is "a very strong old man." Tr. 66. It is hard for him to accept that he can't shovel snow or do his daily things. Tr. 66. He has to be careful when his 18-month old grandson runs to him because if he puts his hands down to lift his grandson "I'm done for that day" and he is on a heating pad "maybe half the next day." Tr. 66. This last happened about a week and a half ago. Tr. 66. His most significant problem is his lower back. Tr. 66. He had major neck surgery and there are days when he gets splitting headaches and he won't be able to move his neck. Tr. 66. His headaches hurt so much they cause him to vomit. Tr. 73. He gets headaches several times a month and the last one was about a week prior. Tr. 73. But if his lower back is out, "I am totally, fully done."

Tr. 66. He cannot do anything that day. Tr. 66. That is when he started having depression. Tr. 66.

When asked how much he can lift, Black explained that he cannot lift much at all, for example he cannot lift his grandson, whom he estimates weighs about 20-25 pounds. Tr. 66-67. This has been the case for about a year. Tr. 67. He is right-handed and has had a couple of surgeries on his left hand and he broke his right hand "like five times" and he drops a lot of things with both hands. Tr. 67. He has had these problems since his surgeries, which he had at least a couple of years prior, and his fingers get drawn up on his right hand and he has to physically push them back open. Tr. 68. It has gotten worse. Tr. 68. He also has bursitis in both shoulders and he gets knots under his shoulder blades and it hurts so bad that "the kids' mom can't even rub them out." Tr. 68. To touch them is like a raw nerve. Tr. 68. He also has problems sleeping and gets a good night's rest about once every three days; if he sleeps too sound, he sleeps on his neck and will usually wake up with a headache. Tr. 73. When he does not sleep well he feels exhausted and gets "short and stuff." Tr. 79.

Black also has problems standing or walking. Tr. 68. When he goes to church he sits in the back pew because he has to rotate his weight so much. Tr. 68. He can't sit or stand for long. Tr. 68. He does goes walking in the woods and last did so the day before the hearing. Tr. 68-69. He stays out as long as he can. Tr. 69. The day before he was out for 2 hours. Tr. 69. He also sits back there a lot. Tr. 69. Usually, he walks up the hill that overlooks the highway and then sits up there. Tr. 69. It takes him about 15 minutes to get up there. Tr. 81. When asked how long, generally speaking, he sits when he is at home, Black stated that he may sit for "a while, but I'm squirming." Tr. 80. He thinks it is probably 30 minutes that he can sit without squirming or moving around. Tr. 80. He can probably stand for about 30 minutes also. Tr. 80.

He is most comfortable lying down on his left side but the amount of time he spends in this position "varies," because he can't be still and he is always repositioning himself. Tr. 81.

Black had been undergoing aquatic therapy. Tr. 69. He explained that when he "drill[s] down in [his] back," he goes to the doctor, who assigns his physical therapy, and he "does the pool thing," but he only gets so many visits a year from his insurance. Tr. 69. So he does it until he is able to get around again and do his daily activities, and then he stops the therapy in order to ration the visits out. Tr. 69.

The ALJ asked Black if he had any mental problems other than depression and Black stated that he gets anxious a lot. Tr. 70. It took a long time to figure out his medication because "I was either like half unconscious—but I still get it, and it's not as often." Tr. 70. They have him on medication now that works most of the time, but he will get anxious if his ex-girlfriend comes to take him to the store and he has an appointment. Tr. 70. Sometimes he will get really anxious when they go to the store and he doesn't want to go in and she gets mad and starts yelling at him. Tr. 70. He feels scared and does not want to be around people. Tr. 70. This has been happening since he quit drinking, in 2012. Tr. 70. His medication is helping and he goes longer now in between episodes and there are fewer episodes "since I'm on this new stuff." Tr. 71. He has been on the new medication for about 6 months. Tr. 71. As for any other mental problems, Black explained that he has seen a psychiatrist since he was in grade school, that he has a problem with trust, and, because of his past, he always thinks that people are out to get him. Tr. 71. He has hurt a lot of people over the years when he was drinking. Tr. 71. He is still hearing voices but not as frequently, maybe a couple of times a week. Tr. 71-72. The last time he heard them was the day before, it is like a demon voice commenting on what he is doing. Tr.

72.  To deal with stress, he goes outdoors or watches bible study on television at least once or twice a day.  Tr. 80.

When asked about the significance of the amended onset date of February 22, 2014, Black stated that that was when he had an injury "and it just kind of catapulted."  Tr. 72. Everything went downhill, deteriorating physically.  Tr. 72.  Mentally, he was on a roller coaster but he thinks it is better now than it was.  Tr. 72.  He still smokes 4-5 cigarettes a day but his doctors are giving him "stuff" and he is on "the gum" and still really trying to quit.  Tr. 73.  He also uses marijuana and his doctor is aware of it.  Tr. 74.  He does not buy it but "finds it."  Tr. 75.  He had received injections for his back but they did not help.  Tr. 76.  The one he got in his hip worked.  Tr. 76.  He clashed with his pain management doctor because he told the doctor that he didn't want to use the fentanyl patches any more and he did not want injections any more.  Tr. 76. That is when he starting seeing Dr. Stutzman.  Tr. 76.  He takes his current medications as prescribed.  Tr. 77.  His prior medications affected his appetite but this is no longer the case.  Tr. 79.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Michelle Edge testified at the hearing.  Tr. 82-87.  The VE discussed Black's past work as a meat dresser, cable installer and motor vehicle assembler.  Tr. 82-83.  The ALJ asked the VE to determine whether a hypothetical individual of Black's age, education and work experience could perform Black's past work or any other work if the individual had the following characteristics: can perform work at the light exertional level; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally crawl; can occasionally reach overhead with the left upper extremity, frequently handle and finger object with the left upper extremity; can perform simple, routine, repetitive

tasks free of fast paced production requirements involving only routine workplace changes; and can have superficial contact with others, i.e., no tasks involving arbitration, negotiation, directing the work of others, or being responsible for the safety and welfare of others.  Tr. 83-84.  The VE answered that such an individual could not perform Black's past work but could perform work as a routing clerk (576,000 national jobs, 30,000 Ohio jobs, 11,000 regional jobs); shipping and receiving weigher (62,000 national jobs, 1,800 Ohio jobs, 600 regional jobs); and mail clerk (77,000 national jobs, 3,000 Ohio jobs, 1,000 regional jobs).  Tr. 83-84.

The ALJ asked the VE if the jobs she identified would still be available if the individual described above had the following, additional limitations: could stand for an hour at a time and resume standing after sitting for five minutes.  Tr. 85.  The VE answered that such an individual could perform the jobs previously identified.  Tr. 85.  The ALJ asked the VE whether her answer would change if the individual could stand for 30 minutes and need to sit for 30 minutes before standing again and the VE answered that such an individual could not perform the jobs identified.  Tr. 85.  The ALJ asked if such an individual could perform sedentary work, and the VE stated that, if such an individual had no sitting limitations, he could.  Tr. 85-86.  The ALJ asked the VE how much time a person could be off-task and still perform the jobs identified and the VE answered 10%.  Tr. 86.

Next, Black's attorney asked the VE how many monthly absences would be tolerated per month and the VE answered no more than two days a month.  Tr. 87.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his May 3, 2016, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2015. This finding adheres to that of the previous decision. Tr. 23.

2. The claimant has not engaged in substantial gainful activity since February 22, 2014, the alleged onset date. This finding departs from that of the previous decision, but only insofar as it reflects the alleged onset date for the present claim. Tr. 23-24.

3. The claimant has the following severe impairments: status-post tendinitis, left hand history of surgery on the left upper extremity, arthritis of the left wrist [hereinafter, collectively, the "left arm impairment"], degenerative disc disease of the cervical spine, status-post L5 fracture, degenerative disc disease of the lumbosacral spine, with radiculopathy [hereinafter, collectively, the "lumbar impairment"], osteoarthritis of the right hip, post-traumatic stress disorder and chronic pain syndrome. This finding departs from that of the previous decision, in order to accommodate the new impairments found in the present evidence. Tr. 24.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. This finding adheres to that of the previous decision. Tr. 25.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant may occasionally crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant may occasionally reach overhead with the left upper extremity, and may occasionally handle and finger objects with the left hand; the claimant is limited to the performance of simple, routine, repetitive tasks, undertaken in a setting free of fast paced production requirements, or more than routine workplace changes, which setting requires no more than superficial contact [defined as precluding tasks involving arbitration, confrontation, negotiation, direction of, persuasion of, or conferral upon the claimant of responsibility for the safety or welfare, of others] with others. This finding departs from that of the previous decision, in order to accommodate the limitations evident in the present record. Tr. 27.

C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

6. The claimant is unable to perform any past relevant work. This finding departs from that of the previous decision, a necessary consequence of the residual functional capacity and the testimony of the vocational expert. Tr. 34.

7. The claimant was born [i]n 1964 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age. This finding departs from that of the previous decision, but only insofar as it reflects the claimant's attainment of greater chronological age. Tr. 34-35.

8. The claimant has at least a high school education and is able to communicate in English. This finding departs from that of the previous decision, in order to reflect the newly reported acquisition of a generalized equivalency degree. Tr. 35.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. This finding adheres to that of the previous decision. Tr. 35.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 21. This finding adheres to that of the previous decision. Tr. 35.

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 22, 2014, through the date of this decision. This finding departs from that of the previous decision, but only insofar as it reflects the alleged onset date for the present claim. Tr. 36.

### V. Plaintiff's Arguments

Black challenges the ALJ's decision on two grounds: the ALJ erred when he did not consider the opinion of Black's treating physician, Dr. Stutzman, and the ALJ erred because he did not consider the combined effect of Black's impairments, including their combined effect on his ability to sustain work activity. Doc. 18, p. 1.

### VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

### A. Dr. Stutzman's opinion

#### 1. The ALJ's failure to consider Dr. Stutzman's opinion was not error because Black did not timely submit Dr. Stutzman's opinion

Black complains that the ALJ did not consider the opinion of his treating physician, Dr. Stutzman. Doc. 18, pp. 13-15. What Black fails to mention in his opening brief, however, is that Dr. Stutzman's opinion had not been timely submitted to the ALJ. Defendant raised the timeliness issue in her brief on the merits and Black did not file a response. The Court ordered Black to respond and address the timeliness issue, which he did. Docs. 23, 24.

Dr. Stutzman completed a physical Medical Source Statement on behalf of Black on March 5, 2016. Tr. 1412-1413. At the beginning of the hearing held on April 1, 2016, the ALJ asked Black's attorney if there was any further evidence not yet submitted relating to Black's disability and the attorney answered, "No, Your Honor. I believe the record is complete." At the end of the hearing, after testimony had been taken, the ALJ told Black's attorney that the record lacked Black's aquatic therapy records and also that Dr. Stutzman had indicated in his treatment note that he had been asked to fill out disability paperwork, but that the ALJ did not see any paperwork in Black's file. Tr. 88. Black's attorney stated that she did not think she had received

anything, she was not sure if Dr. Stutzman completed the paperwork, and she assumed that he had not because she had not received it. Tr. 88. She stated, "But I can double check on that." Tr. 88. The ALJ gave Black's attorney 14 days to submit the additional records, i.e., until April 15. Tr. 90.

In his reply brief, Black's attorney admits that she submitted Dr. Stutzman's opinion to the ALJ after the 14-day period, on April 25. Doc. 23, p. 1; 24-1 (submission form). She explains that Dr. Stutzman's office did not send his opinion with the rest of his records, she contacted Dr. Stutzman's office on April 8, and that "Plaintiff was again provided the form to personally give to the doctor on the 14th."[2] Doc. 23, p. 1. She asserts, "The preference would obviously have been that Dr. Stutzman's RFC was submitted within this [14-day] time frame." Doc. 23, p. 2. She argues that the ALJ "appeared to know this document was forthcoming" yet issued a "rather quick" decision on May 5, "apparently unaware this RFC had been filed." Doc. 23, p. 2.[3] She asserts that the ALJ did not explicitly *require* that Black submit the opinion within 14 days, but "asked," and indicated that he would wait for the additional records before making a decision. Doc. 23, p. 2.

The hearing transcript reads as follows:

ALJ [After telling counsel that there appeared to be outstanding records]: But do you think you could get those other records within the next 14 days?

Atty: I will try, Your Honor.

---

[2] Black's attorney does not explain what she means when she say that Black was "again" given forms to present to his doctor. Regardless, the fact remains that Dr. Stutzman's opinion was not transmitted to the ALJ until April 25.

[3] Counsel's admission here that the ALJ did not realize that Dr. Stutzman's opinion had been submitted is contrary to her position in her opening brief, wherein she argued that the ALJ erred because he did not consider Dr. Stutzman's opinion. See Doc. 18, p. 15 ("This case marks the extreme of an ALJ's failure to be specific as to why a treating physician opinion should be devalued as the ALJ's failure to mention the opinion hardly is specific or good reasons under Sixth Circuit law.") The Court is bewildered as to how a plaintiff could assign error to an ALJ for failing to consider something that he did not know existed. The Court had ordered Black to file a responsive brief to ascertain whether Black had submitted the opinion evidence within 14 days because it could not be determined from the record whether counsel had done so. Had counsel submitted Dr. Stutzman's opinion to the ALJ within 14 days, and the ALJ had not considered it, the outcome of this analysis would have been different.

ALJ: Okay .... And as I've indicated, I'll wait for those additional records, then I'll make a decision in the case.

Tr. 90. The record also shows that, prior to the above exchange, Black's attorney had told the ALJ that she was not sure whether Dr. Stutzman had completed an opinion form, she assumed that he had <u>not</u> completed one, and that she would "double check." Tr. 88. Thus, it does not follow that the ALJ would wait an indefinite amount of time for records that may or may not have existed. Instead, a reasonable reading of the transcript shows that the ALJ offered to leave the record open for 14 days for Black's attorney to submit any outstanding records. Counsel did not submit the records within that time period, nor did she request additional time to do so. The ALJ did not err when he did not consider evidence presented after the time period for submitting additional records had passed and he had not been notified that evidence had been located and additional time was needed to submit it. *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (plaintiff did not show good cause for failing to providing evidence in a timely manner to the ALJ because counsel failed to show why he did not submit the evidence prior to the hearing, or after the hearing but before the ALJ closed the record, or why counsel did not seek to have the record remain open to submit the evidence); *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 734 (N.D.Ohio 2005).

### 2. Dr. Stutzman's opinion is not material

In any event, Dr. Stutzman's opinion is not material. Pursuant to a Sentence Six remand, a district court may remand a case for further administrative proceedings in light of new evidence presented, if a claimant shows that the evidence is new, material, and that there was good cause for not presenting it in the prior proceeding. *Foster v. Halter*, 279 F.3d at 357 (6th Cir. 2001) (citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996)); 42 U.S.C. §

405(g).  Although Black does not state he is seeking a remand pursuant to Sentence Six, it

appears as though that is what he is requesting.  See, e.g., Doc. 23, p. 3 (stating that the Court

may review Dr. Stutzman's opinion "under good cause as new and material evidence.").

Black argues that Dr. Stutzman's opinion is material because Dr. Stutzman opined that

Black had severe pain that interfered with his concentration, took him off task, and caused

absenteeism; he would need additional breaks, although Dr. Stutzman did not specify the

amount; and he stated that Black's degenerative disc disease worsened with prolonged activity.

Doc. 23, p. 3.  However, the ALJ relied on the state agency reviewing opinions that Black could

perform light work, and he included additional postural limitations in his RFC assessment that

the state agency physicians had not assessed, due to Black's lower back and hip problems.  Tr.

33.  Dr. Stutzman's opinion would not have been material because the ALJ relied upon other

evidence, such as Black's credibility and his activities of daily living, to find that Black could

perform functions described in his RFC assessment despite his allegations of limitations due to

pain.

For instance: for each severe impairment, the ALJ detailed the diagnosis, diagnostic

imaging, clinical exam findings, and treatment.  Tr. 28 (lumbar impairment); Tr. 29 (left arm

impairment); Tr. 29-30 (cervical spine impairment); Tr. 30 (right hip).  The ALJ summed up that

Black's symptoms were not as severe as alleged.  Throughout his detailing of this evidence, the

ALJ explained that clinical exam findings were consistently but not universally minimal or

normal.  Black was prescribed medication and reported that it helped, and yet three drug screens

showed that he had not, in fact, been taking his prescribed medications and, as a result, he had

been discharged from two pain management clinics.  E.g., Tr. 28, 33.  He had reported 100%

improvement after physical therapy for his hip and back (Tr. 28, 30) and considerable, long

lasting efficacy of epidural injections in his hip (Tr. 30). He had reported engaging in significant daily activities, such as child care, maintaining a household and his hygiene and grooming, doing martial arts, bow hunting from a tree stand and able to shoot a deer in December 2014, fishing, attending church weekly and other church events, going to his grandson's soccer games, describing himself in a treatment note as "very busy, on the go all the time," and instances of shoveling snow and moving sand. Tr. 32. Black had made inconsistent statements, such as stating that his pain was "always" 8-10/10, yet there were instances he reported pain levels of 4, 3, and 2. Tr. 33. He claimed he could not do the "simplest task" yet had obviously performed more than the simplest tasks, as described above. Tr. 33. He claimed to be compliant with medication but had failed three drug screens for prescribed medication and had been discharged twice from pain management clinics because of it. Tr. 33. Treatment providers had written in their notes that Black was possibly engaging in misrepresentation and was noted to be "manipulative, engaging in untruths and triangulations." Tr. 33. Based on the above, it cannot be said that Dr. Stutzman's opinion is material, i.e., it would change the ALJ's decision, because the limitations assessed by Dr. Stutzman addressed the severity of Black's pain, and substantial evidence in the record supports the ALJ's finding regarding the alleged severity of Black's pain. *See Bass*, 499 F.3d at 513 ("Material evidence is evidence that would likely change the Commissioner's decision.").

### B. The ALJ did not fail to consider the combined effect of Black's impairments

Black argues that the ALJ erred because, although he addressed Black's physical impairments and his mental impairments, he did not "address[] the combined effect of the physical and mental limitations, particularly how they would affect his sustainability in being off task and absent." Doc. 18, p. 17. Black's argument fails. First, as detailed above, the ALJ

explained why he did not find Black to be as limited by his physical symptoms as alleged.  As for Black's relevant alleged mental limitations, the ALJ observed that Black had intact concentration and memory.  Tr. 31-32, 34.  He commented that medications were effective in treating Black's mental symptoms and that there were significant gaps in treatment.  Tr. 31.  With respect to Black's auditory hallucinations, these had been linked to Black's heavy and consistent use of hallucinogens and, in any event, had not been observed to have affected his attention and concentration.  Tr. 31.  In other words, the ALJ did not find Black to have discernible attention and concentration deficits due to his mental impairments that warranted off-task limitations in his RFC and did not credit Black's allegations of the severity of his pain.  The fact that the ALJ did not find Black to be as impaired as alleged does not mean that the ALJ failed to consider the combined effect of his impairments.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.


IT IS SO ORDERED.



Dated: June 27, 2018

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge